Filed 12/29/23  Marriage of Hinman CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of TABETHA and BRIAN HINMAN. | H050359 (Santa Clara County Super. Ct. No. 20FL000321) |
| TABETHA HINMAN, Appellant, v. BRIAN HINMAN, Respondent. | |

In this dissolution of marriage action, Tabetha Hinman appeals an order entered after a bifurcated trial on her claims for reimbursement.  Tabetha[1] sought reimbursement for expenses benefitting respondent Brian Hinman's separate property that were paid during marriage from bank accounts.  The trial court denied most of her reimbursement claims.  Tabetha contends that the trial court erred by (1) incorrectly interpreting the parties' premarital agreement to limit reimbursements from undisputed community property joint accounts and (2) disregarding Tabetha's evidence of transmutation and/or commingling of Brian's premarital bank accounts.  We conclude that the trial court erred in its interpretation of the premarital agreement, but that substantial evidence supports the trial court's findings regarding Brian's premarital bank accounts.  We reverse with

---

[1] As is customary in family law proceedings, we use the parties' first names for clarity.  We intend no disrespect.

directions for the trial court to enter a different order as to the community's right to reimbursements for expenses paid from the parties' undisputed community property joint bank accounts, and we remand the case for the trial court to determine the amount of the reimbursements Brian owes to the community.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Tabetha and Brian married on June 25, 2005, and separated on November 26, 2019. They have one minor child.

The parties met while working at the same company, 2Wire, where Brian was the CEO and Tabetha was general counsel. Tabetha claims that prior to the parties' marriage, Brian insisted on a premarital agreement. After about six months of multiple discussions regarding the agreement, the parties, each with their own attorneys, engaged a mediator to draft the premarital agreement. On June 21, 2005, Tabetha and Brian signed their premarital agreement (PMA), establishing their community and separate property rights during the marriage.

The PMA states, in part, ". . . absent a future agreement in writing by us, our intent is to specifically define property which hereafter remains the separate property of each of us or becomes under the terms of this Agreement either community property or separate property of the other party." In short, the PMA establishes that, absent a signed writing, the parties' premarital assets would remain separate property and any employment earnings during marriage as well as jointly titled assets would be community property.

---

[2] Although neither party raised the issue on appeal, the trial court did not make findings as to the amount to be reimbursed to the community, or whether any interest applies. Tabetha's written closing arguments stated the sums she contends should be reimbursed to the community. In her objections to the proposed statement of decision and reply to Brian's briefing to such objections, Tabetha also requested the court to clarify the expenses to be reimbursed by Brian and opposed Brian's request for further "reconciliation with the experts" to determine the reimbursements. It appears the trial court overruled such objections because the statement of decision is silent on the amount of reimbursements owed.

Brian's net worth is listed in the PMA at about $20 million compared to Tabetha's total assets at about $261,000.

Upon their marriage, Tabetha quit her employment at 2Wire, and the parties resided at one of Brian's two separate property residences. Brian continued working at 2Wire until mid-2006, earning an annual salary of $289,000. Between 2007 to 2015, Brian worked as a venture partner with income that fluctuated, but which, at its peak, was about $750,000 per year. Throughout marriage, Brian paid the community's expenses with his community property employment earnings and with his separate property when the community income was insufficient.

During marriage, Brian spent over $10 million on the construction and maintenance of his two separate property residences, paid from the parties' jointly titled accounts and Brian's premarital accounts.[3] At trial, Tabetha contended the community is entitled to reimbursement for those expenses because the payments came from community property accounts. Brian disputed those allegations, contending the source of the payments came from his separate property. Each party relied on her and his respective interpretation of the PMA to support her and his contentions. We therefore summarize the relevant portions of the PMA.

### A. Separate Property as Defined by the PMA

Under section 5.2, the properties identified on exhibits A and B of the PMA would remain the separate property of Tabetha or Brian unless otherwise specified. Under section 5.4.5 of the PMA, Brian's separate property also included a contractual "management carve-out" right with his then employer, 2Wire, for future income related to the potential sale of 2Wire securities by the company.

---

[3] Tabetha's forensic accountant testified at trial that a total of $15,403,275 had been spent on expenditures for both separate properties; Tabetha claims $13,261,594 derived from community funds. Brian's forensic accountant provided a summary at trial showing the expenditures for both properties totaling $11,744,792; Brian's forensic accountant calculated $363,479 came from community funds.

Exhibit B of the PMA lists Brian's separate property which, at that time, included a residence in Los Gatos, a residence in Carmel Valley, various bank and brokerage accounts, and multiple investments (hedge funds, private investments, and venture capital funds). Brian's premarital and separate property bank and brokerage accounts included a Merrill Lynch brokerage account (Merrill Lynch Account) and a bank account held at Beverly Cooperative Bank (Beverly Account). Most of the expenses for Brian's Los Gatos and Carmel Valley residences were paid from the Merrill Lynch Account and the Beverly Account.

At trial, Tabetha claimed the Beverly Account became a community property joint account within the definition of the PMA because Brian added her as an owner to the account. As to the Merrill Lynch Account, Tabetha claimed it was commingled with community property funds and thus became presumptively community property. Except for the Beverly Account and Merrill Lynch Account, Tabetha did not dispute the character of the other assets identified on exhibit B as Brian's separate property.

### B. Community Property as Defined by the PMA

Sections 5.3 and 5.4 of the PMA identify what would become community property upon marriage, which included a gift from Brian of $4 million to the community, as well as each party's wages, salaries and earnings from employment during marriage, excluding contributions to retirement accounts.

The parties also agreed to open joint accounts upon marriage. Section 6.1 of the PMA—the key section in dispute on this appeal—states: "Common and Joint Accounts. We shall establish jointly owned checking, savings, and/or brokerage accounts for our joint expenses. We shall contribute all community earnings to these accounts *and these accounts will be our community property, owned one-half by each of us regardless of the respective amounts contributed to the accounts by each*. Any items of property purchased by us with funds withdrawn from these jointly owned accounts shall be our community property. *To the extent that either of us contributes separate property funds*

4

*to these joint accounts, the separate property contributions shall become community property not subject to reimbursement.*"  (Italics added.)

Upon their marriage, Brian made the $4 million gift to the community, and the parties also opened two jointly owned bank accounts, the first one at Wells Fargo Bank and later at First Republic Bank (collectively, the Joint Accounts).  During marriage, consistent with the terms of the PMA, Brian deposited his employment earnings in the Joint Accounts.  Brian also regularly deposited funds from his separate property accounts into the Joint Accounts to pay community expenses.

At trial, the parties did not dispute the community property character of the Joint Accounts.  Brian admitted to paying expenses for his separate property residences from the Joint Accounts.  Nevertheless, Brian argued the community was not entitled to reimbursements for his separate property expenditures because the funds in the Joint Accounts originated from his separate property.  Brian claimed his separate property deposits into the Joint Accounts did not automatically become community property the moment the funds were deposited.

### C.  Reimbursements, Ownership, and Commingling as Defined by the PMA

During the bifurcated trial, the parties and the trial court also relied upon language in the PMA governing reimbursements, maintaining and/or changing the ownership and character of property, and commingling of property.

Section 5.10 provides, in part, "[c]ontributions made during the marriage from community property to the improvement of our separate property shall be subject to reimbursement to the community without interest or adjustment for change in value."  Section 5.11.5 also states, in part, "[a]ny payments from community property on a loan, taxes, maintenance, or improvements for the benefit of separate property shall not change the character of such property but shall be subject to reimbursement to the community with reasonable interest subject to any offsets allowed by law."

5

Section 5.11.1 states, in part, "[t]itle shall determine the ownership interest of each of us in any real property held by us or in any personal property which is specifically titled unless we agree otherwise in writing. However, titling errors which are made by third parties, or incorrect titling which clearly conflicts with the intent of a party or parties changing or taking title, are subject to correction." The next paragraph, section 5.11.2, states "a change in the form of separate or community property shall not constitute a change of character of that property. For example, if a non-titled or separate-titled asset is purchased using funds from a party's separate property bank account, the asset remains that party's separate property."

With respect to any transfers of property during marriage, section 5.11.3 states "[n]otwithstanding the provisions of this Agreement, either of us may transfer, convey, devise, or bequeath any property to the other subsequent to the date of marriage. Neither of us intends by this Agreement to limit or restrict in any way the right to receive any such transfer, conveyance, devise, or bequest from the other at such future time. *Such transfers must be evidenced by a written instrument signed by the transferor, except for clothing, jewelry, or personal effects*." (Italics added.)

As to any commingling of property during marriage, section 5.11.4 provides the following: "*Except as otherwise provided in this Agreement*, the occurrence of transfers through a community account or other form of community ownership or the mistaken commingling or otherwise failing to segregate the separate property or separate income of either of us by a third party alone shall not change or constitute a change of character of that property or income, nor shall it constitute a transmutation of that separate property or income into community, quasi-community, joint marital, or other similar type of property, and vice versa, except that the terms of sections 5.11.1 and 5.11.2 shall prevail." (Original underscoring, italics added.)

6

## D. *The Bifurcated Trial and Statement of Decision*

Pursuant to the parties' stipulation, the trial court bifurcated the issue of Tabetha's reimbursement claims. At trial, the parties stipulated that the PMA was valid and binding. They also stipulated to the following fact: "The parties agree the Quickbooks data kept during the marriage upon which both parties are relying in preparing their tracing accurately reflect the financial transactions that took place during the parties [*sic*] marriage, and as such may be relied on for purposes of tracing funds used during the marriage. However, inasmuch as the Quickbooks data is voluminous and was prepared by a third party, each party reserves the right to correct or challenge any entries or comments which the party can show to be erroneous."

In March 2022, trial on the bifurcated issue commenced with testimony from each party and their respective forensic accountants. The forensic accountants provided their analyses regarding the total amount of expenditures for Brian's separate property residences paid from Joint Accounts, the Beverly Account and the Merrill Lynch Account. Because the parties did not dispute the character of the Joint Accounts or the validity of the PMA, the majority of the parties' testimony and exhibits related to the Beverly Account and the Merrill Lynch Account.

To support her claim that Brian added her as an owner of the Beverly Account, Tabetha introduced two documents at trial, trial exhibits 8 and 10. Trial exhibit 8 is a copy of the first page of a bank statement dated May 30, 2014, for the Beverly Account. The bank statement is addressed to "Brian L Hinman [¶] Tabetha Hinman [¶] George R Kaplan PC[.]" Trial exhibit 10 is an untitled bank form for the Beverly Account signed by Brian in 2006 that lists the "Account Owner(s) Name & Address" as "Brian L. Hinman [¶] Tabetha Hinman [¶] George R. Kaplan [¶¶¶] PO BOX 1026 [¶] SALEM, MA 01970-6026[,]" and has the signatures of all three listed individuals underneath. On the left side of the bank form, underneath the section for "Ownership of Account[,]" the content is blank. Per Brian's testimony, trial exhibit 10 is a signature card for the Beverly

Account, identifying the then authorized signatories for the account, not a transfer of ownership of the account to Tabetha. Tabetha, along with his personal accountant, Mr. Kaplan, were signatories to the Beverly Account for convenience and the account is owned by the Brian L. Hinman 2003 Trust Agreement, for which Brian is the sole trustee. Brian provided copies of wire instruction letters dated before and after 2006—the year identified on trial exhibit 10—identifying his trust as the owner of the Beverly Account.

To support her claim that Brian commingled community property funds into the Merrill Lynch Account, Tabetha's forensic accountant identified several large deposits during marriage categorized in the parties' Quickbooks data file as "salary." Brian testified to the source of the large deposits being from his separate property, mainly the contractual "management carve-out right" from his former employer which, per section 5.4.5 of the PMA, is identified as his separate property.

After a two-day bifurcated trial and subsequent briefing related to Tabetha's objections to the proposed statement of decision, the trial court made the following findings and orders: (1) The Joint Accounts were "jointly owned, community accounts" within the definition of section 6.1 of the PMA. However, the language of section 6.1 "does not operate to create a transmutation of separate funds, which were specifically used to pay separate expenses, into community property by the simple act of such funds passing through a joint account. Separate funds that passed through a community account retained their character when thereafter used for separate expenses." Accordingly, with respect to the Joint Accounts and based on the trial court's interpretation of the PMA, the community's right of reimbursement was limited to "only the expenditures from joint accounts made while there was not separate money in the accounts to cover them. . . ." (2) The Beverly Account was and remains Brian's separate property and ownership "never changed so as to make it a jointly-owned or community account" within the definition of section 6.1. The Merrill Lynch Account was and remains Brian's separate property and there was no evidence the account had been a

8

commingled community account. Accordingly, with respect to the Beverly Account and the Merrill Lynch Account, "the community does not have a right to reimbursement to funds from those accounts that were used on [Brian's] separate property residences."

## II. DISCUSSION

On appeal, Tabetha argues the trial court erred by misinterpreting section 6.1 of the PMA and by disregarding her evidence regarding transmutation and/or commingling of the Beverly and Merrill Lynch Accounts. Brian contends the trial court's interpretation of the PMA is correct and reaches an equitable result, and the trial court's findings on the character of the bank accounts are supported by substantial and unrefuted evidence. For the reasons stated below, we conclude the trial court erred in interpreting the PMA to include an exception that separate property funds deposited into the Joint Accounts remained Brian's separate property if the funds were later used to pay his separate property expenses. As to the Beverly Account and the Merrill Lynch Account, we conclude there is substantial evidence to support the trial court's findings and orders.

### A. Standards of Review

We review the interpretation of a contract, including a premarital agreement, de novo. (*Parsons v. Bristol Development Co*. (1965) 62 Cal.2d 861, 865 [contract interpretation is subject to independent review]; *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 13 [rules governing contract interpretation generally apply to premarital agreements].) We review a trial court's findings regarding the character of specific property for substantial evidence. (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 25.) A trial court's factual findings regarding a property's separate or community character is binding and conclusive on review when supported by substantial evidence, even if evidence conflicts or supports contrary inferences. (*Ibid*.; *In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734; *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) On appeal, "[i]t is not our task to weigh conflicts and disputes in the evidence . . . . We must accept as true all evidence and all reasonable inferences from the evidence

9

tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment." (*Howard*, at pp. 630-631.)

> **B.** **Section 6.1 of the PMA Expresses the Parties' Intent to Transform Deposits into their Joint Accounts to Community Property**

Tabetha first claims the trial court erred in finding Brian's "[s]eparate funds that passed through [the Joint Accounts] retained their character [as separate property] when thereafter used for [Brian's] separate expenses." Tabetha contends that under section 6.1, once separate property funds were deposited into the Joint Accounts, they became community property, regardless of how the funds were later spent. She asserts the trial court's interpretation is inconsistent with the PMA, and the community should have been reimbursed for all funds paid out of the Joint Accounts to benefit Brian's separate property residences. Brian claims the trial court's interpretation of section 6.1, in conjunction with section 5.11.4 of the PMA, is correct and logical. He contends neither party would have reasonably intended him to be required to reimburse the community for using his own separate property funds to pay his separate property expenses simply because the funds passed through a joint account. Based on our de novo review of the PMA, we conclude the trial court erred in its interpretation of the PMA.

> **1.** **The Joint Accounts are Community Property for All Purposes**

We apply well-established principles of contractual interpretation to sections 5.11.4 and 6.1 of the PMA. "The rules applicable to the interpretation of contracts have been applied generally to premarital agreements." (*In re Marriage of Bonds*, *supra*, 24 Cal.4th at p. 13; Civ. Code, § 1635 et seq.) The primary object of contract interpretation is to ascertain and carry out the mutual intention of the parties at the time the contract was formed, determined from the writing alone, if possible. (Civ. Code, §§ 1636, 1639; *Santisas v. Goodin* (1998) 17 Cal.4th 599, 608.) When the language of a contract is "clear, explicit, and unequivocal, and there is no ambiguity, the court will enforce the express language." (*In re Marriage of Iberti* (1997) 55

10

Cal.App.4th 1434, 1440 [interpreting stipulated judgments based on the rules applicable to the interpretation of contracts]; Civ. Code, § 1638.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) Courts cannot "substantially alter the agreement reached by the parties as clearly and explicitly stated in [their contract]." (*In re Marriage of Iberti*, at p. 1440.)

We start with the plain language of the sections. Section 5.11.4 provides: "Except as otherwise provided in this Agreement, the occurrence of transfers through a community account or other form of community ownership or the mistaken commingling or otherwise failing to segregate the separate property or separate income of either of us by a third party alone shall not change or constitute a change of character of that property or income, nor shall it constitute a transmutation of that separate property or income into community, quasi-community, joint marital, or other similar type of property . . . ." The section addresses the parties' intended treatment of separate property that enters community accounts or other forms of community ownership held by the parties, and states that, absent an exception in the PMA, the separate property retains its separate character. Such community accounts or forms of community ownership could include bank accounts, business accounts, community investment accounts, or commonly held real estate, to name but a few examples. The trial court, and Brian in this appeal, rely on section 5.11.4 to support the conclusion that Brian's separate property funds which were contributed to the Joint Accounts simply "transferred through" the Joint Accounts and therefore retained their separate property character.

Section 6.1 then states the parties shall establish jointly owned bank accounts which ". . . will be our community property, owned one-half by each of us regardless of the respective amounts contributed to the accounts by each." The last sentence then confirms "[t]o the extent that either of us contributes separate property funds to these joint accounts, the separate property contributions shall become community property not

11

subject to reimbursement." The plain language of the section expresses the parties' intent at the time they signed the PMA to make the Joint Accounts community property for all purposes, regardless of the character of the funds contributed to the Joint Accounts or the disposition of the funds thereafter.

Section 6.1 thus describes the parties' intent to treat separate property funds transferred into "jointly owned checking, savings, and/or brokerage accounts established for their joint expenses" (i.e., the Joint Accounts) differently than the separate property otherwise transferred "through a community account or other form of community ownership" described in section 5.11.4. In other words, separate property funds transferred through or commingled with community accounts retain their separate property character, except if the parties agree otherwise. And as to the specifically identified Joint Accounts, which constitute a defined subset of community accounts, in section 6.1 the parties expressly agreed to treat those specific accounts differently (i.e., to transmute all separate property contributions into the Joint Accounts into community property.)

We respectfully conclude that the trial court's interpretation of section 6.1 in effect altered the PMA to create an exception in which Brian's separate property "that passed though" the Joint Accounts retained its separate property character if it was used for separate property expenses. By adding this qualifier to section 6.1, the trial court exceeded its interpretive authority. (*Marriage of Iberti*, *supra*, 55 Cal.App.4th at p. 1437.)

In *Marriage of Iberti*, the parties entered into a marital settlement agreement which terminated spousal support upon the occurrence of certain events, including when wife stopped enrollment as a full-time student. A few years later, husband filed a request to terminate spousal support because wife had dropped out of college. (*Ibid.*) Wife opposed the termination, claiming she left college because of her mother's mental illness and subsequent suicide; she provided evidence that she returned to college thereafter.

12

(*Id.* at pp. 1437-1438.) The trial court granted husband's request and terminated spousal support. (*Id.* at p. 1438.) On appeal, wife argued the trial court should have "read into the language" of the agreement an exception to termination of support ". . . if for some reason [wife] is unable in good faith to attend college[.]" (*Ibid.*) The appellate court applied the rules of contract interpretation and disagreed with wife. Instead, the appellate court stated "[t]he agreement is not reasonably susceptible of wife's proffered interpretation. She asks this court to add qualifying language to the agreement. To do so would substantially alter the agreement reached by the parties as clearly and explicitly stated in the judgment. This we cannot do." (*Id.* at p. 1440.)

Similarly, in *Marriage of Corona* (2009) 172 Cal.App.4th 1205, the trial court ordered husband to pay a portion of wife's income taxes based on the terms of the parties' marital settlement agreement. On appeal, husband argued he should not have to pay any portion of wife's income taxes engendered by her choice to file under the status of "married filing separately" instead of "married filing jointly[,]" which, according to husband, would have resulted in lower income taxes for wife. (*Id.* at pp. 1213, 1221-1222.) Nothing in the parties' settlement agreement, however, required wife to use a particular tax filing status or to minimize her tax liability. (*Id.* at pp. 1221-1222.) The appellate court rejected husband's argument and concluded the requirements for finding an implied contract provision were not met in the case, i.e., that the term is indispensable to effectuating the parties' intention, so obvious that it need not be expressed, that it would have been addressed had it been called to the parties' attention, that it is legally necessary, and that the contract does not already address the subject of the implication.[4] (*Id.* at p. 1222.) The appellate court affirmed the trial court's order, stating it " '[i]t is not enough to say [a proposed implied provision] is necessary to make the contract fair, or that it ought to have contained a stipulation which is not found in it, or that, without such

_____

[4] Brian does not claim the trial court's orders added implied terms to the PMA but, instead, argues the main issue is solely one of contract interpretation.

13

covenant, it would be improvident or unwise or would operate unjustly; for [parties] have the right to make such contracts.' [Citation.]" (*Id.* at p. 1223, quoting *Cousins Inv. Co. v. Hastings Clothing Co.* (1941) 45 Cal.App.2d 141, 147.)

As these authorities illustrate, the purpose of contract interpretation is to determine the parties' intent at the time of formation based on the express words of the contract. "In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (Code Civ. Proc., § 1858.)

Considered together, section 5.11.4 describes the general rule governing the transfer of separate assets into community accounts, and section 6.1 describes an exception to that rule. Section 5.11.4 applies to a broad category of community accounts or other forms of community ownership. Section 6.1 is an exception to section 5.11.4, on its terms addressing only the Joint Accounts, which according to the PMA, are jointly owned checking, savings and brokerage accounts established by the parties for joint expenses. Had the parties intended to create a further qualification that the character of funds deposited into the Joint Accounts would depend on their intended use, or that separate property funds deposited into the accounts would retain their separate property character if used to pay separate property expenses, they had the ability to so state in the PMA. The parties did not include any such conditional language. Instead, section 6.1 repeatedly states that the Joint Accounts are meant to be community property and all contributions shall become community property without conditions or exceptions.[5]

---

[5] We note the trial court found significant the placement of section 6.1 under the section heading for "Expenses." However, section 13.9 of the PMA specifically states "Section headings are used for reference purposes only and should be ignored in the interpretation of this Agreement." Thus, to the extent the trial court considered the

Applying precepts to contract interpretation to the language of the relevant sections, we construe them to mean that when Brian transferred separate property assets into the Joint Accounts, they became community property.

### 2. *Our Interpretation of Section 6.1 Does Not Render Other Provisions of the PMA Meaningless*

Brian argues in favor of the trial court's interpretation, claiming the straightforward interpretation we have applied would render section 5.11.3 and section 5.11.4 of the PMA meaningless. We are not persuaded.

Section 5.11.3 deals with transfers of ownership between the parties during marriage. Neither party contends ownership of the Joint Accounts was transferred to the other during marriage. Both parties agree that the Joint Accounts, from inception and throughout marriage, were community property. Accordingly, section 5.11.3 does not affect our interpretation of section 6.1, nor does it have any relevance to determining the ownership of the Joint Accounts.

Nor does our interpretation of the PMA's provisions render section 5.11.4 meaningless. By adopting section 5.11.4, the parties expressly agreed to deviate from the statutory presumption that commingled property is community in character. (See, e.g., Fam. Code, § 852, subd. (d) [exception to the transmutation statute for commingled property]; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 611 ["[The community property] presumption applies to property purchased during the marriage with funds from a disputed source, such as an account or fund in which one of the spouses has commingled his or her separate funds with community funds"].) Section 5.11.4, however, is qualified: "*Except as otherwise provided in this Agreement. . . .*" (Italics added.)

section headings dispositive of the parties' intent when drafting section 6.1, we disagree with its emphasis on them based on the express language of sections 5.11.4 and 6.1.

15

As we have explained, section 6.1 is such an exception "as otherwise provided in the Agreement" to section 5.11.4.[6] Section 5.11.4's commingling provision does not apply to section 6.1 because the parties expressly agreed in section 6.1 to transmute all separate property contributed to the Joint Accounts to community property. On its terms, section 6.1 thus precludes the commingling of assets described in section 5.11.4 because all funds contributed to the Joint Accounts are or "shall become" community property. Section 5.11.4, however, preserves the separate character of separate property commingled or transferred through all community accounts and other forms of community ownership not addressed in section 6.1.

Additionally, section 6.1 is the more specific provision controlling the character of the jointly owned bank and brokerage accounts defined in that section, whereas section 5.11.4 addresses the treatment of the more general category of community accounts and other forms of community ownership. "[A] specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, even though the latter, standing alone, would be broad enough to include the subject to which the more specific provision relates. [Citations.]" (*Gen. Insurance Co. of America v. Truck Insurance Exchange* (1966) 242 Cal.App.2d 419, 426; Civ. Code, § 3534 ["Particular expressions qualify those which are general"].) Accordingly, section 6.1 controls the character of the assets in the Joint Accounts, not section 5.11.4.

When read as a whole, the PMA unambiguously declares the parties' intent to maintain their premarital property as separate property and to create new joint accounts that would become their community property accounts to hold community property

---

[6] At oral argument, Tabetha suggested that sections 5.11.4 and 6.1 should be interpreted as essentially the same provision, except that section 5.11.4 addresses solely the circumstance of a third-party transfer of separate property into the parties' community accounts. We are persuaded by the language of the section, with its use of the disjunctive "or" throughout, that section 5.11.4 is not limited to the actions of third parties. Rather, sections 5.11.4 and 6.1 address the character of separate property or income transferred into community accounts.

16

funds, pay community property expenses and/or acquire community property assets during marriage.

### 3. Our Interpretation is Consistent with the Law

Brian argues that as a court of equity, the trial court was bound to reach the result in his favor. Brian claims that he was using his separate property to pay his separate property expenses, although the monies passed through the Joint Accounts in the interim for convenience. He thus contends that it would be inequitable to order him to reimburse the community for expenditures he paid from his separate property.

Brian is correct that family law courts are courts of equity. (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 38.) "Equity, however, may not be used to find liability where the result would nullify a contrary statute. '[A] court of equity will never lend its aid to accomplish by indirect means what the law or its clearly defined policy forbids to be done directly.' [Citations.]" (*Tuthill v. City of San Buenaventura* (2014) 223 Cal.App.4th 1081, 1088, quoting *Jackson v. Torrence* (1890) 83 Cal.521, 537.)

In this case, we are bound by the law to interpret and enforce the terms of the parties' contractual arrangements, and the law precludes us from applying equity to the extent it would nullify the law on contract interpretation and enforcement. (*In re Marriage of Dawley* (1976) 17 Cal.3d 342, 358 ["Having freely contracted [to the definition of separate property in their premarital agreement] . . . the parties are bound by their agreement."].)

Further, our interpretation of the PMA is not inequitable. The parties—each assisted by counsel—established the terms of their PMA and decided to deem all funds contributed to specified joint accounts community property, owned one-half by each party. This agreed-upon provision was neither unjust nor inequitable at the time they agreed on the terms of the contract, nor throughout their marriage; divorce and

17

hindsight do not now make it so. Both parties were aware of the terms of the PMA throughout their marriage. Brian had control over where he deposited his separate funds. Had Brian intended to keep his separate property funds separate, he had the knowledge, control and ability to do so during marriage by declining to deposit his funds into the Joint Accounts.

For these reasons, we reverse the trial court's findings and orders with respect to the Joint Accounts.[7]

### C. *Substantial Evidence Supports the Trial Court's Rulings Regarding the Beverly Account and the Merrill Lynch Account*

Tabetha claims the trial court "improperly disregard[ed] clear evidence" of a transmutation of the Beverly Account and commingling of the Merrill Lynch Account.

As to the Beverly Account, Tabetha claims the trial court ignored trial exhibit 10 (the purported 2006 "signature card") and trial exhibit 8 (the 2014 bank statement). Tabetha claims the two exhibits indisputably show a transfer of ownership of the Beverly Account from Brian's premarital separate property to community property during marriage.

Pursuant to section 5.11.3 of the PMA, "transfers of ownership must be evidenced by a written instrument signed by the transferor." Trial exhibits 8 and 10 do not show any transfer of ownership of the Beverly Account signed by the transferor to Brian and Tabetha jointly. Exhibit 8 is one page of a bank statement that is not signed by any party and, thus, does not meet the requirements of section 5.11.3. Exhibit 10 is an untitled document that, although containing the signatures of Brian, Tabetha and Brian's accountant, contains no terms that evidence a transfer of ownership of the account to Brian and Tabetha as joint owners of the Beverly Account.

---

[7] In light of our decision that all deposits into the Joint Accounts were transmuted to community property, we do not address Tabetha's claims that there was no evidence presented at trial that Brian's separate property retained its separate property character because it simply "transferred through" the joint accounts.

At trial, it was undisputed that the Beverly Account existed before marriage and is identified in the PMA as Brian's separate property. Brian testified the account was set up specifically for the construction of his Carmel Valley property, and is titled in the name of his trust. Brian is the trustor and the sole trustee of the trust. After marriage, in 2006, Brian added Tabetha and his accountant as signatories to the Beverly Account for convenience. Brian testified he never changed ownership or title to the Beverly Account, and the bank account was held by a trust, not an individual. To support his claim that the Beverly Account remained titled under his trust account even after the 2006 "signature card," Brian admitted at trial certain wire transfer instructions to and from various banks throughout 2004 to 2008 which the account name of the Beverly Account was listed as "Brian L Hinman 2003 Trust Agreement."[8]

Accordingly, substantial evidence supports the trial court's findings that (1) ownership of the Beverly Account did not transfer to Brian and Tabetha jointly during marriage, (2) the Beverly Account is not a joint account under the definition of section 6.1 of the PMA, and (3) the Beverly Account remained Brian's separate property throughout the marriage.

As to the Merrill Lynch Account, Tabetha claims the trial court erred by relying only on Brian's testimony that community property funds had not been commingled into the account. Specifically, Tabetha claims the parties' Quickbooks accounts listed deposits in the Merrill Lynch Account categorized as Brian's "salary" and thus, the account was commingled, and Brian failed to meet his burden to show that it was not commingled. Without citing to any legal authority, Tabetha claims Brian was required to show "something visible, such as a record[,]" to rebut the entries stated in the Quickbooks records, and that his testimony alone was insufficient. But it is well established that substantial evidence can consist of the testimony of a single witness. (*In*

---

[8] Based on Brian's statements at trial, due to the passage of time, it appears most of the files for the Beverly Account were no longer available from the bank.

19

*re Marriage of Mix, supra*, 14 Cal.3d at p. 614 [testimony from the wife to explain tracing records is sufficient].)

At trial, Brian testified in detail as to the separate property source of each of the contested deposits in the Merrill Lynch Account. He also explained the "salary" categorized in the Quickbooks data related to the sale of 2Wire securities, which, pursuant to section 5.4.5, is expressly defined as Brian's separate property. The income from the sale was identified by his former employer 2Wire as W-2 earnings for tax purposes, and, accordingly, the Quickbooks data reflected the same tax accounting categorization as "salary." (See, e.g., *In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1480 [husband's profit distributions from his separate property business, although designated as W-2 income for tax purposes, remain husband's separate property].) Brian also testified that all community earnings during marriage were deposited into the Joint Accounts, foreclosing the possibility of community property earnings being deposited in the Merrill Lynch Account.

Based on Brian's testimony, we conclude there was substantial evidence to support the trial court's findings that community funds had not been commingled into the Merrill Lynch Account. As noted above, when we engage in a review under the substantial evidence standard, "the pertinent inquiry is whether substantial evidence supports the court's finding—not whether a contrary finding might have been made." (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 702.) Based on the record before us, there is ample evidence to support the trial court's findings the Beverly Account did not become a joint account during marriage and the Merrill Lynch Account was not a commingled community account. There is substantial evidence to support the trial court's findings that both accounts were Brian's separate property throughout the marriage. The trial court properly denied Tabetha's claims for reimbursements for expenses paid from those two accounts.

### III.  DISPOSITION

We reverse the August 24, 2022 findings and orders regarding the Joint Accounts. The case is remanded for the trial court to determine the amount of reimbursements Brian owes to the community consistent with our opinion.

Each party shall bear its own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3), (5).)

_____

Greenwood, P. J.

WE CONCUR:

_____

Grover, J.

_____

Lie, J.

H050359
Hinman v. Hinman